Upshaw *v.* State

No. 40480 April 22, 1957 94 So. 2d 337

*P. P. Lindholm,* Lexington; *J. A. White,* Durant, for appellant.

*J. R. Griffin, Asst. Atty. Gen.,* Jackson, for appellee.

McGEHEE, C. J.

The appellant, James Upshaw, was indicted for the murder of one Vaudrell (Bud) Shanks. He was tried and convicted, and was sentenced to serve a life term in the state penitentiary.

Both the deceased and the accused were white men, approximately 40 years of age, and had not entertained any illwill toward each other prior to the occasion of the homicide. In fact, their previous acquaintance was merely casual.

The assault made by the accused, James Upshaw, on Bud Shanks occurred on the night of October 9, 1956, between 12:00 and 2:30 A. M. at the home of the accused, where he lived alone, near the small village of Richland in Holmes County. The deceased, Bud Shanks, had been severely beaten by the accused with a bed slat, but his death did not occur until up in the forenoon of October 10, 1956, after he had been found at or near his pickup truck in front of the home of the accused.

It was shown by the testimony of Ernest Shanks, brother of the deceased, as a witness for the State, that the witness and Bud Shanks had traveled in the latter's Ford pickup truck from their home about 15 to 20 miles west of Richland to the home of accused; that the journey took approximately 3 hours while they were both drinking "moonshine" corn whiskey from a gallon jug or glass bottle, containing at the time a remnant of about one and one-half pints of such whiskey; that when they arrived at Gage's store at Richland they continued drinking their whiskey and also drank some beer; that at about 4:00 o'clock that afternoon Ernest Shanks drove Bud's pickup truck to the accused's home, leaving Bud at the said store, drunk; that the accused not having then returned home from work, later arrived and found the witness asleep in the truck parked in front of the house of the accused; that the accused upon learning that Bud Shanks was still at Gage's store drunk, took the pickup truck and went alone to the store and brought Bud back with him to his house; that thereafter the accused and the witness went to the home of a negro tenant by the name of Percy (Rock) Wade where they

ate their supper, and from where the negro brought a meal to Bud at the home of the accused; that later in the night they decided to get another gallon of whiskey, which was located and procured by the negro who was accompanied on the errand by the accused and the witness Ernest Shanks, the said Bud Shanks remaining at the home of the appellant; that after drinking from this second gallon jug or glass bottle of moonshine corn whiskey until after midnight, the witness and Bud Shanks lay down on the only bed in the house of the accused until the latter procured the bed slat from a stack of bed slats on the floor in the room, and said to his three visitors, "You s . . o. . b . . (plural), get the hell out of here and go home."

Since there had been no previous ill-feeling indicated between the parties, the jury was warranted in reasonably believing that the accused, who had been sitting on the floor with the negro while the Shanks brothers were continuing to occupy the bed of the accused, became exasperated and wanted his bed since it was then far past midnight and he had been at work on the day before and evidently intended to go back to work during the following day. At any rate, the accused, according to the testimony of the witness Ernest Shanks, suddenly began beating the witness with the bed slat, with the result that both the witness and the negro immediately left the scene, went to the home of the negro and went to bed.

Before leaving the scene the witness Ernest Shanks says that as he was leaving the home of the accused he saw him through the window beating Bud Shanks with the same bed slat. The action of the witness is somewhat unexplainable, except on the basis of fear and the injuries that he had just received, since he knew that his brother Bud Shanks was a disabled war veteran, weigh-

ing about 110 pounds and had bad eyesight, and was incapable of coping alone with his assailant.

On the next morning at about 9:00 o'clock the negro suggested to the witness that they should go to the home of the accused and see what had happened to Bud Shanks. Upon arriving at the home of the accused they found Bud Shanks sitting beside his truck, with his head against the wheel thereof, and helpless. The witness had observed his said brother going out of the house toward the truck as the witness was leaving there the night before, and had seen the accused continuing to beat him with the bed slat on the way out to the truck.

Thereupon the witness and the negro carried Bud Shanks into the house of the accused and placed him on the latter's bed. The witness then sent the negro to get a doctor and a constable, and the witness then departed into the woods where he remained until the second morning after the assault, and was then informed by the negro that his brother Bud Shanks was dead. The accused was absent from his home when Bud was discovered in a helpless condition at his truck in front of the home of the accused on the next morning after the assault, and it may be assumed that the accused had gone on about his work earlier that morning.

The sheriff listed the multiple wounds found on the body of the deceased when he examined him at the place of business of the undertaker. A physician made a sufficient examination of the body on the next morning after the assault to be able to testify that whoever inflicted the wounds was the person who had killed Bud Shanks. According to the testimony of the sheriff and the undertaker the deceased had suffered approximately 21 wounds inflicted by a blunt instrument, his skull had been cracked and considerable blood was found at the scene of the assault. In other words, the victim had been brutally and remorselessly beaten and left to die.

The accused did not testify at the trial in his own behalf nor did he introduce any other witnesses to testify for any purpose in his behalf.

 █ Clearly the corpus delicti was amply established, and the jury was fully warranted in believing that Bud Shanks had come to his death through a criminal agency, and the jurors were amply warranted in believing from the circumstances and the testimony of the witness Ernest Shanks that the man came to. his·death at the hands of the accused. No autopsy was necessary under the facts hereinbefore set forth. An inquest was had and the verdict of the jury was that Bud Shanks had come to his death at the hands of some person to the jurors unknown. We are therefore of the opinion that no error was committed in denying the motion of the accused for an autopsy.

One of the grounds assigned for a reversal of the case is that after 10 jurors had been finally accepted to try the case the court adjourned until the next morning; that thereupon the circuit judge and the district attorney went across the street from the courthouse into a cafe to get something to eat before leaving for their respective homes. While there the sheriff came in and reported that Jack Barwick, one of the 10 jurors who had been finally accepted, both by the State and the defendant, had received word that his child was critically ill and that his presence was needed at home. Of course neither the defendant nor his counsel were present at that time, the defendant being in jail and the attorney being enroute from Lexington to his home at Durant. The circuit judge agreed with the sheriff for the juror to be excused for the reason stated. On the next morning when the defendant and his counsel learned that only 9 of the 10 men were left on the jury panel the attorney moved that the court enter a mistrial or that a .new panel of 12 jurors be tendered the defendant before he

exhausted his one remaining peremptory challenge The trial judge overruled the motion but allowed the defendant one additional peremptory challenge, leaving him two that had not been exercised. ⬛ ⬛ We think that the judge did the only humane thing that was left for him to do under the circumstances. If the defendant and his attorney had been present at the time Mr. Barwick was excused, there would have been no valid objection that they could have rightfully urged against the action taken by the trial judge under the circumstances.

⬛ ⬛ We think that under Section 1764, Code of 1942; Parker v. State, 201 Miss. 579, 29 So. 2d 910; Sullivan v. State, 155 Miss. 629, 125 So. 115; Mississippi & S. V. R. Co. v. Brown, 160 Miss. 123, 132 So. 556; and Section 1796, Code of 1942, the laws with reference to empanelling of jurors are directory, and that therefore no reversible error was committed by the action of the trial court complained of in this instance. The judge was not passing on the qualifications of or empanelling this juror, who had already been adjudged to be qualified as a member of the jury panel, but was merely exercising his statutory right to excuse the juror because of the serious illness of a member of his family.

We do not think that any of the other errors assigned are well taken. Therefore the case should be affirmed.

Affirmed.

*Lee, Arrington, Ethridge and Gillespie, JJ., concur.*